IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THE WEST VIRGINIA MUTUAL INSURANCE
COMPANY, a West Virginia Corporation,

        Plaintiff,

v.                              Civil No. 1:11-CV-32
                              (Judge Keeley)

ANA CORTES VARGAS,

        Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 55] AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 53]

Pending before the Court are the parties' competing motions for summary judgment. The plaintiff, the West Virginia Mutual Insurance Company ("West Virginia Mutual"), seeks a declaration that the available limit of liability under the Extended Reporting Endorsement ("tail endorsement" or "tail policy") it issued to Dr. Richard R. Lotshaw ("Lotshaw") is $687,235.79. (Dkt. No. 55). The defendant, Ana Cortes Vargas ("Vargas"), seeks a declaration that the available limit of liability under Lotshaw's tail endorsement is $1,000,000, and that any costs associated with providing a defense to Lotshaw in Vargas's malpractice action are supplemental to – and not within – that policy limit. (Dkt. No. 53). Alternatively, Vargas seeks reformation of Lotshaw's tail policy. The motions are fully briefed and ripe for review. For the reasons that follow, the Court **GRANTS** West Virginia Mutual's motion for summary judgment (dkt. no. 55) and **DENIES** Vargas's motion for

## MEMORANDUM OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

summary judgment. (Dkt. No. 53). The Court **DECLARES** the available liability limits under West Virginia Mutual's tail policy to satisfy the claims in the case of The West Virginia Mutual Insurance Company vs. Ana Cortes Vargas, Civil Action No. 11-CV-32 to be $687,530.79.

## I.

The material facts in this case are not in dispute. (Dkt. No. 53 at 2). Lotshaw performed surgery on Vargas on July 20, 2007. Approximately four months after that surgery, Lotshaw canceled his medical professional liability policy with West Virginia Mutual, which provided up to $1,000,000 in liability insurance per medical incident. In its place, he purchased a tail endorsement from West Virginia Mutual. "'Tail insurance' . . . covers a professional insured once a claims made malpractice insurance policy is canceled, not renewed or terminated and covers claims made after such cancellation or termination for acts occurring during the period the prior malpractice insurance was in effect." W. Va. Code § 33-20D-2(a). Lotshaw elected to pay the $103,406 premium for his tail insurance in quarterly installments over a three-year period.

On July 17, 2009, Vargas sued Lotshaw for malpractice related to her July 2007 surgery. When Vargas filed her lawsuit, Lotshaw

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

was current on all quarterly installment payments for his tail insurance. After Vargas sued him, however, he defaulted on his next quarterly installment due on January 31, 2010, and he never paid another premium. (Dkt. No. 55-1 at 12).

Following Lotshaw's failure to make his January 2010 quarterly installment payment, West Virginia Mutual informed him in a letter dated February 10, 2010 that, unless he paid the entire balance due on his $103,406 premium by March 17, 2010, it would take the following actions:

- Reduce his tail endorsement's liability limits by a "pro-rata reduction . . . based upon the amount of premium that you have paid as a ratio to the total amount due;" and

- Include in the tail endorsement's liability limits all previously supplemental costs, including the costs associated with defending Vargas's malpractice case.

(Dkt. No. 55-1 at 12). Despite this notice, Lotshaw failed to pay the remaining balance on his tail policy. (Dkt. No. 55-1 at 14). West Virginia Mutual therefore amended Lotshaw's policy in accordance with its February 10, 2010 notice. At the time of his default, Lotshaw had paid $77,585 of the $103,406 total premium due on his tail policy. (Dkt. Nos. 56 at 3; 60 at 4). Due to his

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

default, West Virginia Mutual reduced the limits of his policy pro-rata from $1,000,000 per incident to $750,005, to reflect the amount of the premium he had paid. (Dkt. No. 55-1 at 15-16). It also allocated defense costs associated with the Vargas litigation to fall within that reduced liability limit, a move that effectively reduced Lotshaw's liability limits even further. West Virginia Mutual maintains that, under the terms of its tail policy, those reductions apply to all claims made after October 31, 2007, the date Lotshaw canceled his malpractice policy, and are thus applicable to Vargas's claim. (Dkt. No. 55-1 at 13, 15).

Vargas settled her malpractice claim with Lotshaw in August 2011. (Dkt. No. 56 at 5). Subsequently, West Virginia Mutual filed this action seeking a determination of the amount of insurance proceeds available under Lotshaw's tail policy to settle Vargas's claim. (Dkt. No. 3). Vargas has conceded that West Virginia Mutual may interplead the liability limits of its tail endorsement, but she disputes the actual amount of those limits. (Dkt. No. 8 at ¶ 18).[1] Lotshaw's personal liability is not an issue in this action. (Dkt. No. 35).

---

[1] Although West Virginia Mutual initially named its insured, Lotshaw, as a defendant, it later dismissed him on August 19, 2011 pursuant to a joint stipulation. (Dkt. No. 35).

### MEMORANDUM OPINION AND ORDER GRANTING
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
### DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At the heart of the parties' dispute is whether, following Lotshaw's default, West Virginia Mutual's reduction of the liability limits of his tail policy was lawful. West Virginia Mutual contends that it was, and that its inclusion of the costs associated with the defense of the Vargas malpractice case is also lawful. It therefore asserts that the amount of the policy limits available to settle Vargas's claim is $687,235.79. (Dkt. No. 3 at 7).

Vargas, on the other hand, argues that West Virginia Mutual's reduction of Lotshaw's liability limits following his default on his premium payments is ineffective under West Virginia law, and that the available coverage should be $1,000,000. (Dkt. No. 8 at ¶ 23). In the alternative, she contends that the policy limits should be $974,473.86 (the original liability limit of $1,000,000 minus the cost of defending Vargas's malpractice case). Id. at ¶ 29.

### II.

### A. <u>Summary Judgment</u>

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists "if the

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson, 477 U.S. at 248. The same standard applies to cross motions for summary judgment. See Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) ("When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'") (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n. 4 (1st Cir. 1997)).

### B. **Declaratory Judgment**

The Declaratory Judgment Act authorizes district courts to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. In the Fourth Circuit, "a declaratory judgment action is appropriate 'when the

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and . . . when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Centennial Life Ins. Co. v. Poston, 88 F.3d 255, 256 (4th Cir. 1996) (citing Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir. 1937) (internal citation omitted)). Here, because the entry of a declaratory judgment will resolve the parties' dispute over the applicable liability limits of Lotshaw's tail policy, the Court's exercise of jurisdiction over this matter is proper.

Pursuant to Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), the applicable law in a diversity case such as this is determined by the substantive law of the state in which a district court sits.[2] This includes the forum state's prevailing choice of law rules. See Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496–97 (1941). The parties agree that the substantive law of West Virginia governs the interpretation and application of the tail endorsement.

_____

[2]    It is undisputed that the parties are diverse and more than $75,000 is in controversy. Thus, the Court has subject matter jurisdiction over this matter. See 28 U.S.C. § 1332.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**III.**

The Court must apply the well-settled law of West Virginia that, "'[w]here provisions of an insurance policy are plain and unambiguous and where such provisions are not contrary to a statute, regulation or public policy, the provisions will be applied and not construed.'" Progressive Paloverde Ins. Co. v. Hartford Fire Ins. Co., 356 F.3d 524, 527 (4th Cir. 2004) (quoting Deel v. Sweeney, 383 S.E.2d 92, 94 (W. Va. 1989)). Neither party argues that the terms of Lotshaw's tail endorsement are ambiguous.[3] Rather, they focus on whether the terms of that insurance policy are enforceable under West Virginia law.

**A. West Virginia Mutual's Motion for Summary Judgment**

West Virginia Mutual asserts that the terms of its tail endorsement comply with and are enforceable under applicable West Virginia law. In West Virginia, a medical malpractice insurer such as West Virginia Mutual must, "[u]pon cancellation, nonrenewal or termination of any claims made professional malpractice insurance policy . . . offer to the insured tail insurance coverage." W. Va.

---

[3]     Although Vargas alleged in her counterclaim that the tail endorsement language regarding the inclusion of defense costs within the physician's liability limits upon a default is ambiguous (dkt. no. 8 at ¶ 26), she has not raised that issue on summary judgment.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Code § 33-20D-3(a). The insurer also must offer the purchaser of a tail endorsement "the opportunity to amortize the payment of premiums for tail insurance over a period of not more than thirty-six months, in quarterly payments." Id. § 33-20D-3(b). It is undisputed that West Virginia Mutual offered Lotshaw a tail endorsement when he canceled his medical malpractice insurance, and also offered him the option of paying his premium for the tail endorsement in quarterly installments over a 36 month period (dkt. no. 55-1 at 4-5), which Lotshaw accepted..

Pursuant to W. Va. Code § 33-20D-3(c), malpractice carriers such as West Virginia Mutual must submit to the West Virginia Insurance Commissioner a plan to determine the partial limits of a tail policy in the event an insured defaults on an amortized payment. See also W. Va. Code R. §114-30-6.2. West Virginia Mutual did this. On August 23, 2005, it wrote a letter to the Commissioner notifying him of proposed changes to its treatment of a default by an insured paying for tail coverage in quarterly installments. That letter stated in pertinent part:

> If the physician fails to pay the installments, his/her liability is reduced to an amount commensurate with the premium that has been paid. . . . The change that we request places the coverage for defense within the limit of liability until such time as the premium is paid in full. Once the total premium has been paid, the

**THE WEST VIRGINIA MUTUAL INS. CO. V. VARGAS**                1:11CV32

MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

> supplementary payments revert to being outside the limit
> of liability.

(Dkt. No. 55-1 at 1)(emphasis added).

The Commissioner approved this proposed change on October 24, 2005. (Dkt. No. 55-1 at 1). In light of the fact that West Virginia Mutual submitted the proposed change to its tail policy to the Commissioner as required by § 33-20D-3 and W. Va. Code R. §114-30-6.2, it complied with West Virginia law.

In the event an insured defaults on a tail policy's quarterly installment payment, the Commissioner's regulations require that "the insurer shall notify the insured by certified mail that the entire balance is due and payable within 30 days of receipt of said notice." W. Va. Code R. §114-30-6.2. West Virginia Mutual wrote to Lotshaw on February 10, 2010, notifying him of his failure to make his quarterly installment by January 31, 2010. (Dkt. No. 55-1 at 12). That letter plainly gave Lotshaw notice of the following possible reduction in the coverage of his tail policy:

> As stated in the "WARNING" that was attached to your original Extended Reporting Endorsement quotation, certain coverage changes take place should you default in payment. If the full balance is not received in our office by March 17, 2010, the limits of liability under your Extended Reporting Endorsement will be reduced. This pro-rata reduction will be based upon the amount of premium that you have paid as a ratio to the total amount due. Further, default in payment will result in all

## MEMORANDUM OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

<u>Supplementary Payments including defense costs becoming</u>
<u>included within the pro-rated limits of liability.</u>

(Dkt. No. 55-1 at 12) (emphasis added). This notice complied with

W. Va. Code R. §114-30-6.2 by providing Lotshaw with five weeks (or

35 days) to pay the remaining balance of his premium.

Responding to West Virginia Mutual's contention that its tail

endorsement complied with applicable West Virginia law, Vargas in

a footnote contends that there is a factual question about whether

Lotshaw actually received this "WARNING" (dkt. no. 55-1 at 6),

noting there is no evidence Lotshaw himself signed the return

receipt.[4] (Dkt. No. 58 at 1-2 n.2). She also contends that, even if

Lotshaw received it, this notice was legally insufficient because

---

[4]     Substantive footnotes pepper Vargas' response and, indeed,
her own motion for summary judgment. While the Court has considered the
arguments raised there, it also notes that a growing list of authority
from other circuits suggests that "arguments raised in footnotes are not
preserved" for appellate purposes. SmithKline Beecham Corp. v. Apotex
Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006); see Ethypharm S.A. France
v. Abbott Laboratories, No. 11-3602, 2013 WL 238794, at n. 13 (3d Cir.
Jan. 23, 2013) ("[A]rguments raised in passing (such as, in a footnote),
but not squarely argued, are considered waived.") (quoting John Wyeth &
Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 (3d Cir. 1997));
Nat'l Foreign Trade Council v. Natsios, 181 F.3d 38, 60 n. 17 (1st Cir.
1999) ("We have repeatedly held that arguments raised only in a footnote
or in a perfunctory manner are waived."); Williams v. Studivent, No.
1:09CV414, 2009 WL 3837627 (M.D.N.C. Nov. 16, 2009) (argument raised in
footnote and not pursued further in brief deemed waived); In re UBS AG
ERISA Litig., No. 08 CIV. 6696 RJS, 2012 WL 1034445 (S.D.N.Y. Mar. 23,
2012) ("Arguments which appear in footnotes are generally deemed to have
been waived." (quoting In re Crude Oil Commodity Litig, No. 06 Civ. 6677,
2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007) (citing City of Syracuse
v. Onondaga Cnty., 464 F.3d 297, 308 (2d Cir. 2006)).

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

it violated West Virginia Code § 33-20C-4(b), which requires a ninety-day notice for nonrenewal. (Dkt. No. 58 at 1-2 n.2).

There is no material issue of fact in dispute about whether Lotshaw received notice from West Virginia Mutual. First, it is highly debatable whether § 33-20C-4(b) even applies to West Virginia Mutual in this case. West Virginia Mutual's letter dated October 23, 2007 to Lotshaw establishes beyond per adventure that it was Lotshaw – not West Virginia Mutual – who canceled his medical professional liability policy. (Dkt. No. 55-1 at 4). In her own memorandum in support of her motion for summary judgment, Vargas admits the same. (Dkt. No. 54 at 2). Furthermore, even if Lotshaw somehow did not receive the WARNING appended to the February 10, 2010 letter sent by West Virginia Mutual, he had notice of the consequences of failing to pay his quarterly premiums as early as November 28, 2006. In the amendatory endorsement to Lotshaw's medical professional liability policy, West Virginia Mutual notified him that, should he fail to pay a quarterly installment, the limit of his tail policy would be reduced and any defense costs included within it. (Dkt. No. 3-1 at 7, 24). Finally, when Lotshaw failed to pay the January 2010 quarterly installment, West Virginia Mutual notified him of his right under the policy to pay the remaining balance of his premium and maintain his full,

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

$1,000,000 liability limit under the tail endorsement. (Dkt. No. 55-1 at 12). In consideration of Lotshaw's receipt of all of these warnings, whether he signed the return receipt is not a material issue that would bar summary judgment for West Virginia Mutual.

Based on the undisputed, material facts in this case, West Virginia Mutual has clearly established that Lotshaw's tail policy, and its administration of that policy, complied with applicable West Virginia law: West Virginia Mutual offered Lotshaw tail insurance when he canceled his malpractice insurance; it submitted proposed changes to its tail endorsement to the Commissioner for approval; and it gave Lotshaw more than thirty days within which to pay the missed premium.

### B. Vargas's Motion for Summary Judgment

Asserting that West Virginia Mutual defines the applicable law too narrowly, Vargas advances six (6) arguments in support of her contention that West Virginia Mutual's tail endorsement violates many aspects of West Virginia law and public policy. First, she asserts that West Virginia Mutual's reduction of liability limits is impermissibly retroactive in violation of W. Va. Code § 33-6-21. Second, she argues that West Virginia Mutual did not comply with its representations to the Insurance Commissioner about the temporary nature of the defense within limits penalty, and that,

13

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

contrary to W. Va. Code § 33-6-21, West Virginia Mutual "annulled" a portion of Lotshaw's tail insurance when it reduced the applicable policy limits. Third, she argues that the inclusion of defense costs within those limits violates the public policy of West Virginia. Fourth, she contends that West Virginia Mutual denied Lotshaw due process when it reduced his policy limits without notice and a hearing. Fifth, she contends that West Virginia Mutual is estopped from reducing Lotshaw's policy limits. Finally, she seeks reformation of the tail endorsement to allow her to recover the original $1,000,000 liability limit, less only the amount of the unpaid premium. The Court will address each of these arguments in turn.

**(1)**

Vargas  contends that West Virginia Mutual's reduction of Lotshaw's tail policy's liability limits was impermissibly retroactive in contravention of its own underwriting rules and representations to the West Virginia Insurance Commissioner in 2005. (Dkt. No. 54 at 5). In support of her argument, Vargas relies on West Virginia Mutual's internal policy II.-H, "Endorsement or Change to Policy," which states: "Policies may be changed by endorsement effective on the postmark date of the written request by the agent or insured unless a later date is requested." (Dkt.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

No. 55-1 at 3). She contends that West Virginia Mutual improperly reduced Lotshaw's policy limits retroactively (thus applying the reduced liability limit to her malpractice claim), rather than prospectively from January 31, 2010, the postmarked date of the amended tail endorsement.

According to the correspondence between West Virginia Mutual and Lotshaw, however, neither an agent nor Lotshaw – the insured – sought a reduction in his tail policy's limits. <u>See</u> (Dkt. No. 55-1 at 12). That reduction, as well as the shifting of Lotshaw's defense costs to within policy limits, occurred solely as a consequence of the terms of his tail endorsement, which unambiguously states that if the insured fails to pay the remaining premium balance, the "limit of liability applicable to the extended reporting period will be reduced pro-rata to an amount equal to the limit of liability that would have been provided based on the amount of additional premium paid." (Dkt. No. 55-1 at 10).

That same provision also warned Lotshaw that, in the event he defaulted on a quarterly installment payment, certain supplementary payments would be included within the applicable liability limits of his policy. <u>Id.</u> Thus, the reduction in the liability limit of his tail policy was not a "change" to that policy but rather the consequence of the application of unambiguous terms in that policy.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Therefore, because that reduction was not a "change" to the tail policy but an integral component of it, the underwriting provision relied on by Vargas is inapplicable to the issues in dispute.

Furthermore, W. Va. Code § 33-20D-3 contemplates the very reduction in the liability limit of Lotshaw's tail policy being challenged by Vargas: "Each licensed malpractice insurer shall submit for approval, by the commissioner, a plan for determination of partial limits in the event of default on amortized payment." That section makes clear that, under Lotshaw's tail policy, it is the insured's default on an amortized payment, and not the written request of an agent or insured included in West Virginia Mutual's internal policy II.-H, that triggers the reduction. Thus, it was Lotshaw's default on his January 2010 quarterly installment payment, not a request by him or a West Virginia Mutual agent, that triggered the ultimate reduction in his policy's limits. West Virginia Mutual's internal policy II.-H has no applicability to this case.

**(2)**

Vargas next argues that West Virginia Mutual's shift of defense costs to within Lotshaw's policy limits is contrary to representations it made to the Insurance Commissioner in a letter dated August 23, 2005 (dkt. no. 55-1 at 1). As a result, she urges

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

that, under Syl. pt. 2 of <u>Joy Technologies, Inc. v. Liberty Mutual</u> <u>Insurance Co.</u>, 421 S.E.2d 493 (W. Va. 1992), the Court should conclude that West Virginia Mutual's failure to conform its subsequent administration of Lotshaw's tail policy to those representations violated West Virginia public policy.

Vargas challenges West Virginia Mutual's alleged failure to comply with the following representation to the Insurance Commissioner:

> Once the total premium has been paid, the supplementary payments revert to being outside the limit of liability. This change will assure that the Mutual is not compromised because the premium collected will be adequate for the coverage provided.

(Dkt. No. 55-1 at 1). She maintains that:

> [T]he promised temporary nature of the penalty, and the opportunity to fully restore coverage, was never shared with the insured and, indeed coverage was unequivocally and permanently reduced, contrary to what was represented to the Commissioner.

(Dkt. No. 54 at 7).

There simply is no evidentiary support for any contention that West Virginia Mutual failed to inform Lotshaw he could cure his default, or that it violated its representations to the West Virginia Insurance Commissioner. In point of fact, the record is clear that West Virginia Mutual repeatedly notified Lotshaw of his opportunity to cure his default. Even before Lotshaw purchased tail

insurance coverage, he had notice from West Virginia Mutual that it could shift any defense costs to within his liability limits should he fail to pay the balance of his premium following default on a quarterly installment payment. Lotshaw also received such notice in an amendatory endorsement to his medical malpractice policy that West Virginia Mutual issued on November 1, 2006 (dkt. no. 3-1 at 7, 24), and again in the written warning accompanying its quote for the tail endorsement dated October 23, 2007. (Dkt. No. 55-1 at 6).

After Lotshaw's default, West Virginia Mutual explained to him in a letter dated February 10, 2010, that, if he did not pay the full balance of his tail insurance premium by March 17, 2010, it would reduce his liability limit and a "default in payment will result in all Supplementary Payments including defense costs becoming included within the pro-rated limits of liability." (Dkt. No. 55-1 at 12). That letter also referred Lotshaw to the warning accompanying his tail insurance coverage quote, which had expressly warned that defense costs would be included within the liability limit if he failed to pay his total premium after a default on his quarterly installment payments. (Dkt. No. 55-1 at 6). Based on these notices, there can be no dispute about whether Lotshaw was notified by West Virginia Mutual that temporary penalties for failing to pay a quarterly installment would become permanent

should he default on the premium balance remaining on his tail policy.

Vargas's reliance on Syl. pt. 2 of Joy Technologies, Inc., 421 S.E.2d at 493, is misplaced. There the West Virginia Supreme Court of Appeals reversed a circuit court's grant of summary judgment for a defendant-insurer based on its conclusion that West Virginia law, not Pennsylvania law, applied to the construction of a disputed pollution exclusion. This was because Pennsylvania law would compel a result that expressly contradicted testimony given by insurance company officials to the West Virginia Insurance Commissioner, as well as the Commissioner's own understanding of the insurer's representations as set forth in the Commissioner's affidavit. The Supreme Court of Appeals declined to apply Pennsylvania law and construed the exclusion consistent with the insurer's representations to the Commissioner. Id. at 498-99.

Notably, Joy Technologies, Inc. has only been applied in cases involving choice of law issues or questions about the interpretation of the particular policy exclusion at issue in the case. See Nadler v. Liberty Mut. Fire Ins. Co., 424 S.E.2d 256, 265 (W. Va. 1992) (recognizing that "[i]n Joy Technologies, public policy played a part in our rejection of Pennsylvania law as controlling the meaning of an exclusionary clause in a commercial

### MEMORANDUM OPINION AND ORDER GRANTING
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
### DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

liability policy issued in Pennsylvania to a Pennsylvania corporation"); and United Nuclear Corp. v. Allstate Ins. Co., 285 P.3d 644, 655 (N.M. 2012) (citing Joy Techs. Inc. to illustrate the drafting history of the disputed "occurrence clause").

Even if a plausible argument could be made that the issues here are on all fours with those in Joy Technologies, Inc., the factual record establishes that West Virginia Mutual's administration of the tail endorsement did not conflict with its representations to the Commissioner. In August 2005, West Virginia Mutual informed the Insurance Commissioner that, once an insured in default paid the total premium due, defense costs would return to outside the policy's liability limit.

Here, despite the fact that he was given notice and five weeks to cure his default, Lotshaw never paid the total premium due. Thus, it was his inaction, not any action by West Virginia Mutual, that made his default penalties permanent. Had he paid the total premium due, the shift of defense costs to within his tail policy's liability limit would have been temporary, exactly as West Virginia Mutual had represented to the Commission on August 23, 2005. See (Dkt. No. 55-1 at 1) ("The change that we request places the coverage for defense within the limit of liability until such time as the premium is paid in full."). Because West Virginia Mutual did

not contravene its representations to the Insurance Commissioner,

Vargas's argument to the contrary fails.

**(3)**

Vargas's next argument, that West Virginia Mutual "annulled"

a portion of Lotshaw's tail insurance coverage when it reduced the

applicable policy limit, also fails. West Virginia Code § 33-6-21,

Annulment of Liability Policies, provides:

> No insurance policy insuring against loss or damage through
> legal liability for the bodily injury or death by accident of
> any individual, or for damage to the property of any person,
> shall be retroactively annulled by any agreement between the
> insurer and the insured after the occurrence of any such
> injury, death, or damage for which the insured may be liable,
> and any such attempted annulment shall be void.

Chapter 33 does not define the term "annul." Black's Law

Dictionary defines "annul" as "to reduce to nothing." Black's Law

Dictionary (6th ed. 1991). Webster's Third New International

Dictionary agrees: to annul is "to reduce to nothing." According to

Webster's, to reduce is "to diminish in size, amount, extent, or

number." Id. (definition 1(b)). Thus, while "annul" and "reduce"

represent related concepts, they are not synonymous. In this case,

West Virginia Mutual reduced Lotshaw's liability limit from

$1,000,000 to $750,005. By definition, such a reduction is not an

annulment, and, by its plain terms, § 33-6-21 does not apply in this case.

Nor does Vargas offer any compelling statutory, regulatory, or policy reason why this Court should treat the reduction of Lotshaw's liability limit as an annulment. By statute, West Virginia requires providers of tail insurance to "plan for determination of partial limits in the event of default on amortized payment." W. Va. Code § 33-20D-3. (emphasis added). Clearly, the legislature anticipated that reductions in tail policy limits would occur in the event an insured failed to pay the total premium due. Significantly, the legislature added language about partial limits to the statute in 2002, well after § 33-6-21 was first enacted in 1957. See 1957 W. Va. Acts 338. Thus, application of § 33-6-21 under the facts here would contravene the legislative intent evinced in § 33-20D-3.

More broadly, the Supreme Court of Appeals of West Virginia has never concluded that, for the purpose of § 33-6-21, West Virginia public policy demands that a reduction be treated as an annulment. In one of only two cases construing that statute, the court observed, albeit in a footnote, that an insurance provider may have violated the statute where it agreed with a potential

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

insured to waive all coverage. <u>Farmers Mut. Ins. Co. v. Tucker</u>, 576

S.E.2d 261, 264 n.4 (W. Va. 2002). No waiver of all coverage

occurred here, and no basis exists to argue that § 33-6-21 applies

to the instant facts.

**(4)**

Vargas next contends that, under <u>Gibson v. Northfield Ins.

Co.</u>, 631 S.E. 2d 598 (W. Va. 2005); and <u>Cunningham v. Hill</u>, 698

S.E.2d 944 (W. Va. 2010), a shift of defense costs to within

liability limits contravenes West Virginia public policy.

<u>Cunningham</u> voided certain provisions in two underinsured motorists'

policies, after finding that they directly conflicted with W. Va.

Code § 33-6-31(b). <u>Cunningham</u>, 698 S.E.2d at 950. <u>Gibson</u> held that

a defense within limits provision in a municipal ambulance

service's liability policy violated W. Va. Code § 16-4C-16, which

requires ambulance services to maintain $1,000,000 in liability

coverage, and W. Va. Code § 3-6-31(a). <u>Gibson</u>, 631 S.E.2d at 604

n.8, 606.

Vargas contends that the holdings in these cases dictate a

finding that defense within limits provisions in tail endorsements

violate West Virginia's public policy. Unlike the policies under

review in <u>Gibson</u> and <u>Cunningham</u>, however, no specific statute is

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

violated by the defense within limits provision of West Virginia Mutual's tail endorsement. Despite this, Vargas contends that the defense within limits provision in Lotshaw's tail endorsement violates the overarching public policy of West Virginia's medical malpractice "system," as exemplified by W. Va. Code § 55-7B-8(d), which conditions a cap on non-economic damages upon maintenance of $1,000,000 of medical liability insurance.[5]

The particular features of West Virginia's tail insurance statutory scheme at issue in this case do not support the extension of Gibson and Cunningham urged by Vargas. First, this case does not involve an activity for which West Virginia's legislature has set a minimum amount of liability coverage. The provision relied on by Vargas is found within Article 7B, Medical Professional Liability, Chapter 55, Actions, Suits, and Arbitration; Judicial Sale, of the West Virginia Code. That statute applies only to medical professional liability insurance. Lotshaw's tail endorsement, by contrast, is mandated and controlled by a separate chapter, within a separate article, of the West Virginia Code. See W. Va. Code

---

[5]    Vargas also argues that Monongalia General Hospital, where Lotshaw operated on Vargas, required Lotshaw to maintain $1,000,000 in liability insurance, exclusive of defense costs. The internal policies of Monongalia General Hospital, however, are not law and cannot determine the outcome here.

## MEMORANDUM OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

§ 33-20D-1 et seq. Moreover, § 55-7B-8(d) does not require medical professionals to maintain $1,000,000 of liability coverage; rather, it conditions the benefit of capped non-economic damages on their maintenance of $1,000,000 of liability coverage.

Even if the Court were to read § 55-7B-8(d) as a de facto requirement that physicians carry $1,000,000 in medical professional liability coverage, such a mandate would not automatically apply to Lotshaw's tail endorsement. When West Virginia's legislature enacted the tail insurance statutory scheme in 1991, see 1991 W. Va. Acts 983, it did not include a statement of legislative purpose. Later, however, when it enacted a related statute in 2003 that instituted tax credits for tail insurance premiums, the legislature stated that the statute's specific purpose was "the promotion of stable and affordable . . . medical malpractice liability tail insurance premium rates [to] induce retention of physicians practicing in the state . . . and effectively decrease the cost of  medical malpractice liability insurance premiums and medical malpractice liability tail insurance premiums." 2003 W. Va. Acts 1377, codified at W. Va. Code § 11-13T-1.

## MEMORANDUM OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This statement of legislative purpose underscores that, at least as it relates to tail endorsements, the strong public policy of West Virginia is to promote affordable, accessible tail coverage that balances the interests of both patients and physicians. To adopt Vargas's argument and foreclose carriers of tail insurance from including defense costs within the available liability limits upon an insured's default, would, by judicial dictate, increase the cost of tail insurance in West Virginia and run afoul of the legislature's stated goal of promoting stable and affordable tail insurance premiums. This the Court declines to do. The defense within limits provision in West Virginia Mutual's tail policy therefore does not violate the public policy of West Virginia.

**(5)**

Vargas argues that, under Zaleski v. West Virginia Physicians' Mutual Insurance Co., 647 S.E.2d 747 (W. Va. 2007), West Virginia Mutual denied Lotshaw due process when it reduced his liability limits without a hearing. This argument is equally unpersuasive. Zaleski, which held that "[p]hysicians who have been afforded the benefit of medical liability insurance coverage through West Virginia Physicians' Mutual Insurance Company are entitled to due process protection in seeking review of any non-renewal decision

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

made by the company," id. at Syl. pt. 6, is factually distinguishable from the case at bar. First, the policy at issue here involves tail insurance, not medical malpractice insurance. Moreover, as already discussed, the reduction of Lotshaw's liability limit resulted from his failure to cure his default, not a decision by West Virginia Mutual not to renew his coverage. Moreover, in the years since it decided Zaleski, the West Virginia Supreme Court of Appeals has never cited the case, nor has it ever indicated an inclination to extend coverage to facts such as those here.

Even assuming the applicability of Zaleski to the instant facts, the reduction of the liability limit of Lotshaw's tail endorsement does not fail for lack of notice. As already discussed, in its quotation for tail insurance, as well as in the policy itself, West Virginia Mutual unambiguously notified Lotshaw about the penalties he would incur upon default. He therefore had notice that, if he defaulted on his quarterly installment payments and then failed to pay the outstanding premium balance, he would be subject to certain penalties. When Lotshaw did default, he incurred the penalties about which he had notice. Thus, unlike the facts in Zaleski, the reduction of the liability limit of Lotshaw's tail

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

policy was totally foreseeable to him and well within his power to prevent.

**(6)**

**(a)**

Vargas's next argument – that West Virginia Mutual is estopped from reducing the liability limit of Lotshaw's tail insurance policy – is also unavailing. Relying on <u>Potesta v. United States Fidelity & Guaranty Co.</u>, 504 S.E.2d 135 (W. Va. 1998), she contends that because West Virginia Mutual defended Lotshaw in the underlying action, it is estopped from asserting a coverage-based defense to payment absent a reservation of rights. Additionally, she claims that she detrimentally relied on representations made by Lotshaw's attorney as to his client's tail policy limits, and that West Virginia Mutual acted in bad faith by failing to issue a reservation of rights to Lotshaw.

In <u>Potesta</u>, the Supreme Court of Appeals held that:

[I]n order to rely on the doctrine of estoppel to prevent an insurer, who has previously stated one or more reasons for denying coverage, from asserting other, previously unarticulated reasons for denying coverage, the insured must prove that s/he was induced to act or to refrain from acting to her/his detriment because of her/his reasonable reliance on the previously stated grounds for declination.

Id. at 317. Thus, in order to raise estoppel in the context of an insurance contract one must first be an insured, and also must have reasonably relied upon a representation of the insurer.

Vargas can establish neither. Here, it is Lotshaw – not Vargas – who is West Virginia Mutual's insured. Vargas offers no authority suggesting that, as a non-insured, she may estop an insurer from denying coverage to its insured under the terms of its policy. Nor does she offer any evidence that she stands in Lotshaw's shoes for coverage purposes.  See (Dkt. Nos. 26; 35) (stipulating that neither West Virginia Mutual nor Vargas would pursue Lotshaw for amounts over and above the tail policy's liability limits, and dismissing Lotshaw from the suit, without assigning Lotshaw's rights under the policy to Vargas). Cf. Marlin v. Wetzel Co. Bd. of Ed., 569 S.E.2d 462, 469, 472-73 (W. Va. 2002) (holder of certificate of insurance stood in shoes of insured, and could therefore estop the insurer from denying coverage when the certificate holder reasonably relied to his detriment upon a misrepresentations in the certificate).

Vargas also cannot establish that she reasonably relied on any representations of West Virginia Mutual regarding the amount of coverage available under Lotshaw's tail policy. On August 27, 2010, Vargas's attorney learned from defense counsel that Lotshaw's tail

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

policy limits would not be $1,000,000, as initially disclosed, but rather $750,005. He also learned that amount was subject to further reduction based on the inclusion of Lotshaw's defense costs. (Dkt. No. 8-4). Vargas now argues that she had reasonably relied on an earlier e-mail from defense counsel stating the limits of Lotshaw's tail policy were $1,000,000, and she did not settle early in order to take advantage of the full liability limits under the policy.

There are several reasons why this argument is unpersuasive. First, although he may have been paid by West Virginia Mutual, the attorney representing Lotshaw in Vargas's malpractice action was not an agent of West Virginia Mutual under West Virginia law. See Jackson v. State Farm Mut. Auto. Ins. Co., 600 S.E.2d 346, 359 (W. Va. 2004) ("Therefore, generally the lawyer for the insured . . . is not an agent of the insurer so that his or her conduct may be imputed to the insurer."); Barefield v. DPIC Cos., Inc., 600 S.E.2d 256, 268 (W. Va. 2004) (citing Rules of Professional Conduct 1.7, 1.8(f), and 5.4(c) to support conclusion that a defense attorney hired by insurance company to represent insured does not represent insurer); State ex rel. Allstate Ins. Co. v. Gaughan, 508 S.E.2d 75, 89 (W. Va. 1998) ("the insurer actually hires the attorney to represent the insured"). Thus, any statement made by that attorney

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

cannot be attributed to West Virginia Mutual and is not binding upon it.

More fundamentally, however, it is clear that Vargas had constructive notice about the fact that Lotshaw's tail policy limits were subject to reduction in the event he defaulted on his premium payments. From the time she filed suit in 2009, Vargas and her attorney knew Lotshaw had canceled his medical professional liability policy with West Virginia Mutual in 2007 and purchased a tail endorsement. Pursuant to that endorsement's unambiguous terms, and as contemplated by West Virginia Code § 33-20D-3(c), the available liability limit was subject to reduction in the event Lotshaw defaulted on a quarterly installment payment.

**(b)**

To the extent Vargas argues that the Court may apply <u>Potesta</u> to expand Lotshaw's tail policy coverage beyond its terms, that argument fails as a matter of law. "Generally, the principle[] of . . . estoppel [is] inoperable to extend insurance coverage beyond the terms of an insurance contract." Syl. pt. 5, <u>Potesta</u>, 504 S.E.2d at 137. <u>Potesta</u> provides three exceptions to that general rule, including where an insured has been prejudiced because:

> (1) an insurer's, or its agent's, misrepresentation made at the policy's inception resulted in the insured being prohibited from procuring the coverage s/he desired; (2)

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____

> an insurer has represented the insured without a
> reservation of rights; and (3) the insurer has acted in
> bad faith.

Id. at syl. pt. 7. These exceptions are inapplicable to Vargas since, as noted earlier, she is not West Virginia Mutual's insured and has offered no reason why she should be treated as such.

Furthermore, this Court declines Vargas's invitation to disregard the clear focus of Potesta's first exception on misrepresentations made at the policy's inception. Cf. Westfield Ins. Co. v. Paugh, 390 F. Supp. 2d 511, 530 (N.D.W. Va. 2005) ("[T]he focus of an inquiry into coverage by estoppel is . . . on the misrepresentations that were made by the insurer or its agent 'at the policy's inception'").

Only Lotshaw, the insured, may claim a right of estoppel under Potesta. To allow Vargas to do so would, in essence, permit her to mount a third-party bad faith claim against West Virginia Mutual, which she clearly may not do. See W. Va. Code § 33-11-4a; Syl. pt., Elmore v. State Farm Mut. Auto. Ins. Co., 504 S.E.2d 893 (W. Va. 1998).

**(7)**

Alternatively, Vargas urges the Court to reform the tail policy to restrict any reduction of the policy's original $1,000,000 liability limit to the amount of Lotshaw's default

rather than proportionally as the policy provides. "[R]eformation is appropriate only where there is a mutual mistake. . . . Also, reformation is appropriate only if the written agreement or insurance policy does not conform to the clear unwritten agreement between the parties." Ohio Farmers Ins. Co. v. Video Bank, Inc., 488 S.E.2d 39, 44 (W. Va. 1997). Accident or fraud may provide additional grounds for reformation. Id. at 43.

There is no evidence that Lotshaw's tail policy was the product of mutual mistake, fraud, or accident, or that it fails to conform to some clear, unwritten agreement between Lotshaw and West Virginia Mutual. On the contrary, the policy unambiguously states that, if the insured fails to make a quarterly premium payment, the entire balance becomes due. Moreover, it is clear under the policy that, if the insured fails to pay the remaining premium balance, the "limit of liability applicable to the extended reporting period will be reduced pro-rata to an amount equal to the limit of liability that would have been provided based on the amount of additional premium paid." (Dkt. No. 55-1 at 10).

Before Lotshaw purchased the tail policy, West Virginia Mutual warned him about these penalties. (Dkt. Nos. 55-1 at 6, 3-1 at 24). Consequently, no evidence supports a contention that the tail policy he purchased was the product of mutual mistake, fraud, or

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

accident, or that it somehow fails to conform to an unwritten agreement of the parties. Therefore, there is no justification to reform the contract.

**IV.**

There remains one final issue. Because Lotshaw elected to pay his premium in quarterly installments over three years, Vargas points out that a portion of Lotshaw's quarterly payment was a finance charge assessed by West Virginia Mutual. All told, Lotshaw would have paid $118,554.07 for the $1,000,000 in liability coverage had he completed his scheduled payments. (Dkt. No. 54 at 13 n.35). At the time of his default in 2009, he actually had paid $77,585 of the premium due. (Dkt. No. 60 at 4).

Vargas contends that West Virginia Mutual's calculation of the tail policy's reduced liability limit fails to account for the fact that Lotshaw no longer owes any finance charges. In reply, West Virginia Mutual suggests that, to the extent it miscalculated the pro-rata reduction, the liability limits under the policy may be subject to slight modification. (Dkt. No. 60 at 2).

Regardless of the finance charges Lotshaw no longer owes to West Virginia Mutual, it is clear that Lotshaw had paid $77,585 of the $103,406 tail insurance premium at the time of his default, or 75.03 percent of the total premium due. Per the policy, the

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

available liability limit under the policy is to be reduced pro rata to reflect the amount of the premium actually paid. In other words, the liability limit available after Lotshaw's default was 75.03 percent of the original policy limit, or $750,300. Again, per the policy, the liability limit after default is to be further reduced by the cost of Lotshaw's defense, which was $62,769.21. (Dkt. No. 55-1 at 9). Therefore, the available liability limit under Lotshaw's tail coverage is $687,530.79, which is $295 more than the liability limit posited by West Virginia Mutual. See (dkt. no. 60 at 2) (West Virginia Mutual's concession that, to the extent it miscalculated the pro-rata reduction, the liability limits may be subject to slight modification).

## V. CONCLUSION

For the reasons discussed, the Court **GRANTS** West Virginia Mutual's motion for summary judgment (dkt. no. 55), **DENIES** Vargas's motion for summary judgment (dkt. no. 53), and **DECLARES** the available liability limits under West Virginia Mutual's tail policy to satisfy the claims in the case of The West Virginia Mutual Insurance Company vs. Ana Cortes Vargas, Civil Action No. 11-CV-32 to be $687,530.79.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of both orders to counsel of record.

It is so **ORDERED.**

DATED: March 20, 2013

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE